## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF KENTUCKY
### ASHLAND DIVISION
### CIVIL ACTION NO.  3:17-CV-00037-HRW

**Branch Banking & Trust Company**                                    **PLAINTIFF**

**v.**


**Fannin Automotive Family, Inc., et al,**                              **DEFENDANTS**

### ANSWER AND COUNTERCLAIMS


Defendants, Fannin Automotive Family, Inc., Jim Fannin Motors, Inc., Fannin and Fannin, LLC, Christopher K. Fannin, and Gary R. Fannin (collectively "Fannin Defendants"), by counsel, file this Answer to Plaintiff's Amended Complaint and these Counterclaims.

1. Fannin Defendants admit the averments in Plaintiff's Amended Complaint Paragraph 1.

2. Fannin Defendants admit the averments in Plaintiff's Amended Complaint Paragraph 2.

3. Fannin Defendants admit the averments in Plaintiff's Amended Complaint Paragraph 3.

4. Fannin Defendants admit the averments in Plaintiff's Amended Complaint Paragraph 4.

5. Fannin Defendants admit the averments in Plaintiff's Amended Complaint Paragraph 5.

6. Fannin Defendants admit the averments in Plaintiff's Amended Complaint Paragraph 6.

7. Fannin Defendants are without information or belief as to the averments in Paragraph 7 and thus deny the same.

8. Fannin Defendants are without information or belief as to the averments in Paragraph 8 and thus deny the same.

1

9.  Fannin Defendants are without information or belief as to the averments in Paragraph 9 and thus deny the same.

10. Paragraph 10 contains only legal statements and requires no admission or denial.

11. Paragraph11 contains only legal statements and requires no admission or denial.

12. Paragraph 12 contains only legal statements and requires no admission or denial.

13. Paragraph 13 contains only legal statements and requires no admission or denial.

14. Paragraph 14 contains only legal statements and requires no admission or denial.

15. Regarding Paragraph 15, Fannin Defendants admit only that they entered into an agreement on August 11, 2015, and state that the documents speak for themselves.

16. Regarding Paragraph 16, Fannin Defendants admit only that the Borrowers executed a promissory note evidencing obligations under a certain agreement which was not a demand note. Fannin Defendants deny all other averments in Paragraph 16, note that no addendum is attached to the Amended Complaint, and state that the documents speak for themselves.

17. Regarding Paragraph 17, Fannin Defendants admit only that the contents of Exhibit A speak for themselves.

18. Regarding Paragraph 18, Fannin Defendants admit only that the contents of Exhibit C speak for themselves.

19. The Fannin Defendants are without knowledge as to the averments in Paragraph 19 particularly because the definition of "currently" is ambiguous; therefore, they deny the facts in Paragraph 19.

20. The Fannin Defendants deny the averments in Paragraph 20 and state that Exhibit D speaks for itself.

21. The Fannin Defendants deny the averments in Paragraph 21 and state that Exhibit E speaks for itself.

22. The Fannin Defendants deny the averments in Paragraph 22 and state that Exhibit F speaks for itself.

23. The Fannin Defendants deny the averments in Paragraph 23 and state that Exhibit G speaks for itself.

24. The Fannin Defendants deny the averments in Paragraph 24 and state that Exhibit H speaks for itself.

25. The Fannin Defendants deny the averments in Paragraph 25 and state that the Term Note, Exhibit F, speaks for itself as does Exhibit I.

26. The Fannin Defendants deny the averments in Paragraph 26 and state that the Term Note, Exhibit F, speaks for itself as does Exhibit J.

27. Paragraph 27 merely defines terms and thus does not require admission nor denial; to the extent one is required, the averments are denied.

28.  The Fannin Defendants deny the averments in Paragraph 28 and state that Exhibit K speaks for itself.

29. The Fannin Defendants deny the averments in Paragraph 29 and state that Exhibit L speaks for itself.

30. The Fannin Defendants deny the averments in Paragraph 30 and state that Exhibit M speaks for itself.

31. The Fannin Defendants deny the averments in Paragraph 31 and state that Exhibit N speaks for itself.

32. The Fannin Defendants deny the averments in Paragraph 32 and state that Exhibit O speaks for itself.

33. Paragraph 33 merely defines terms and thus does not require admission nor denial; to the extent one is required, the averments are denied.

34. The Fannin Defendants deny the averments in Paragraph 34.

35. The Fannin Defendants deny the averments in Paragraph 35 and state that Exhibit P speaks for itself.

36. The Fannin Defendants are without sufficient knowledge to admit or deny the averments in Paragraph 36; therefore, they deny the averments in Paragraph 36.

37. The Fannin Defendants are without sufficient knowledge to admit or deny the averments in Paragraph 37; therefore, they deny the averments in Paragraph 37.

38. The Fannin Defendants are without sufficient knowledge to admit or deny the averments in Paragraph 36 or to determine the meaning therein; therefore, they deny the averments in Paragraph 38.

39. The Fannin Defendants deny the averments in Paragraph 39.

40. The Fannin Defendants deny the averments in Paragraph 40.

41. The Fannin Defendants deny the averments in Paragraph 41.

42. The Fannin Defendants deny the averments in Paragraph 42.

43. The Fannin Defendants deny the averments in Paragraph 43 and state that the loan documents speak for themselves.

44. The Fannin Defendants deny the averments in Paragraph 44 and state that Exhibit A speaks for itself.

45. The Fannin Defendants deny the averments in Paragraph 45 and state that Exhibit L speaks for itself.

46. The Fannin Defendants are without sufficient knowledge to admit or deny the averments in Paragraph 46; therefore, they deny the averments in Paragraph 46.

47. The Fannin Defendants are without sufficient knowledge to admit or deny the averments in Paragraph 47; therefore, they deny the averments in Paragraph 47.

48. The Fannin Defendants are without sufficient knowledge to admit or deny the averments in Paragraph 48; therefore, they deny the averments in Paragraph 48.

49. The Fannin Defendants deny the averments in Paragraph 49.

50. The Fannin Defendants deny the averments in Paragraph 50.

51. The Fannin Defendants hereby restate and incorporate their answers contained in Paragraphs 1-50 as if fully set forth herein.

52. The Fannin Defendants deny the averments in Paragraph 52.

53. The Fannin Defendants deny the averments in Paragraph 53.

54. The Fannin Defendants deny the averments in Paragraph 54.

55. The Fannin Defendants deny the averments in Paragraph 55.

56. The Fannin Defendants deny the averments in Paragraph 56.

57. The Fannin Defendants hereby restate and incorporate their answers contained in Paragraphs 1-56 as if fully set forth herein.

58. The Fannin Defendants deny the averments in Paragraph 58.

59. The Fannin Defendants deny the averments in Paragraph 59.

60. The Fannin Defendants deny the averments in Paragraph 60.

61. The Fannin Defendants deny the averments in Paragraph 61.

62. The Fannin Defendants deny the averments in Paragraph 62.

63. The Fannin Defendants hereby restate and incorporate their answers contained in Paragraphs 1-62 as if fully set forth herein.

64. The Fannin Defendants deny the averments in Paragraph 64.

65. The Fannin Defendants deny the averments in Paragraph 65.

66. The Fannin Defendants deny the averments in Paragraph 66.

67. The Fannin Defendants deny the averments in Paragraph 67.

68. The Fannin Defendants deny the averments in Paragraph 68.

69. The Fannin Defendants hereby restate and incorporate their answers contained in Paragraphs 1-68 as if fully set forth herein.

70. The Fannin Defendants deny the averments in Paragraph 70.

71. The Fannin Defendants deny the averments in Paragraph 71.

72. The Fannin Defendants deny the averments in Paragraph 72.

73. The Fannin Defendants deny the averments in Paragraph 73.

74. The Fannin Defendants deny the averments in Paragraph 74.

75. The Fannin Defendants hereby restate and incorporate their answers contained in Paragraphs 1-74 as if fully set forth herein.

76. The Fannin Defendants deny the averments in Paragraph 76.

77. The Fannin Defendants deny the averments in Paragraph 77.

78. The Fannin Defendants deny the averments in Paragraph 78.

79. The Fannin Defendants deny the averments in Paragraph 79.

80. The Fannin Defendants hereby restate and incorporate their answers contained in Paragraphs 1-79 as if fully set forth herein.

6

81. The Fannin Defendants deny the averments in Paragraph 81.

82. The Fannin Defendants deny the averments in Paragraph 82.

83. The Fannin Defendants deny the averments in Paragraph 83.

84. The Fannin Defendants deny the averments in Paragraph 84.

85. The Fannin Defendants deny the averments in Paragraph 85.

86. The Fannin Defendants deny the averments in Paragraph 86.

87. The Fannin Defendants deny the averments in Paragraph 87.

88. The Fannin Defendants hereby restate and incorporate their answers contained in Paragraphs 1-87 as if fully set forth herein.

89. The Fannin Defendants deny the averments in Paragraph 89.

90. The Fannin Defendants deny the averments in Paragraph 90.

91. The Fannin Defendants deny the averments in Paragraph 91.

92. The Fannin Defendants deny the averments in Paragraph 92.

93. The Fannin Defendants deny the averments in Paragraph 93.

94. The Fannin Defendants deny the averments in Paragraph 94.

95. The Fannin Defendants deny the averments in Paragraph 95.

96. The Demand for Relief section of the Amended Complaint does not require admission nor denial; to the extent one is required, the Fannin Defendants deny the averments in that section.

97. All facts not specifically admitted are denied.

## AFFIRMATIVE DEFENSES

**1.** Plaintiff has failed to state a claim upon which relief may be granted.

**2.** Plaintiff has failed to mitigate any damages claimed by it.

7

3.  Plaintiff has failed to satisfy conditions precedent.

4.  Plaintiff's claims are barred by the doctrines of waiver, estoppel and/or laches.

5.  Plaintiff's claims are barred by its own negligence or wrongful acts.

6.  Plaintiff's claims are barred by the doctrine of unclean hands.

7.  Plaintiff's claims are barred by illegality.

8.  Plaintiff's claims are barred by commercial impossibility due to governmental titling timeframes.

9.  Plaintiff's claims are barred by duress.

10. Defendants are entitled to a setoff of Plaintiff's claims by virtue of their Counterclaims.

11. Plaintiff is the first party to breach the parties' contract and, therefore, is barred from enforcing any provisions of the parties' contract.

12. Defendants specifically reserve the right to assert any jurisdictional defenses and all affirmative defenses not expressly mentioned in this Answer.

## COUNTERCLAIMS

Come Fannin Automotive Family, Inc., Jim Fannin Motors, Inc., Fannin and Fannin, LLC, Christopher K. Fannin, and Gary R. Fannin (collectively "Fannin Counterclaimants"), by counsel, and for their Counterclaims against Branch Banking and Trust Company (hereinafter "BB&T") state as follows:

### WORKING RELATIONSHIP WITH BB&T

1.  The summer of 2015, Brent Lee of BB&T discussed a floor plan loan and a consolidation loan with Fannin Automotive Family, Inc., Jim Fannin Motors, Inc., Fannin and Fannin, LLC as borrowers and Christopher Fannin and Gary Fannin as guarantors using the dealership real estate located at 7405 U.S. Route 60 in Ashland, KY, as collateral.

2.  At that time, the Fannin Counterclaimants operated Boyd County Ford in downtown
    Ashland (hereinafter the "Ford dealership") as well as dealerships on U.S. Route 60 that
    sold Toyota, Mercedes Benz, Mazda and Hyundai (hereinafter, collectively, the "Toyota
    dealership").

3.  BB&T obtained an appraisal on the Toyota dealership property valuing it at $19.825
    million, a few million dollars higher than earlier appraisals.

4.  Based on its appraisal, BB&T entered into loan agreements for $11.35 million on the real
    estate and a floor plan totaling $16.5 million.

5.  Under the Floor Plan, the Fannin Counterclaimants had 15 days after the sale of a
    covered vehicle to repay the principal amount outstanding on the purchase of that vehicle
    without incurring a late fee. See Schedule A, page 22 of the Floor Plan.

6.  BB&T began pressuring the Fannin Counterclaimants to repay the principal amount
    within 7 days of the purchase of a vehicle, a timeframe that was not required by Schedule
    A and that could not be met consistently due to paperwork requirements of third party
    governmental entities needed to process transfers of vehicles in three states, Kentucky,
    Ohio and West Virginia.

7.  In late 2015 and early 2016, Freddie Betz of BB&T began pressuring the Fannin
    Counterclaimants to reduce the total indebtedness to BB&T by finding a different bank to
    take out the real estate loan. He suggested the Fannin Counterclaimants contact
    Community Trust Bank, specifically Brent Lee, who had just left BB&T to work for
    Community Trust Bank.

8.  Because of BB&T's request, when Brent Lee of Community Trust Bank contacted the
    Fannin Counterclaimants about taking out the real estate loan, the Fannin

Counterclaimants agreed to present a loan application to Community Trust Bank and worked with it to provide answers to its requests for information.

9. To obtain approval for the loan, the Fannin Counterclaimants contracted with an accounting and business consultant and set up a voluntary field financial review and audit for the Ford dealership.

BB&T'S FALSE ALLEGATIONS OF FRAUD

10. In June of 2016, the initial BB&T account representatives, Randy Spaw and Freddie Betz withdrew from the Fannin accounts.

11. Mitch Turknett of BB&T called to say that BB&T was calling the loans and terminating the floor plan agreements because they mistakenly believed that the Fannin Counterclaimants were "double floor-planning" cars between the Ford dealership and the Toyota dealership based on several Ohio titles that were not signed on the back.

12. The Fannin Counterclaimants informed BB&T that Ohio titles require a separate assignment form and do not require the actual titles to be signed, thus Ohio titles without a signature are not evidence of double floor-planning.

13. The Fannin Counterclaimants explained that some cars were moved between the dealerships but those cars were used Fords traded in for new vehicles at the Toyota dealership that does not sell Fords, and thus were moved to the Ford dealership for sale in order to obtain the best price but only after correctly assigning title.

14. Despite the reasonable explanations and proof of correct titling by the Fannin Counterclaimants, BB&T's false allegations of fraud set BB&T on a course of action to destroy the Fannin Counterclaimants' business and the reputation of the owners and

individuals, spilling over into all the Fannin Counterclaimants' business dealings and greatly impacting any effort to conduct business or sell businesses.

15. Based on the false accusations, BB&T refused to continue with the floor plan and improperly called the loans with no reasonable time to meet the demand in contradiction with the rights afforded the Fannin Counterclaimants under Kentucky law.

16. BB&T's false allegations impacted the plans of the Fannin Counterclaimants to sell their dealerships; and, because of BB&T's false allegations, sales fell through.

17. In the summer of 2016, Mitch Turknett of BB&T ended the floor plan immediately with no time to find further financing and demanded payment on the loans within seven days, a time period far too short to establish financing and a time period improper under Kentucky law providing inadequate notice as well as inadequate time.

18. After numerous conversations with Mitch Turknett, Tommy Lanier and Tommy Pittman, all with BB&T, the Fannin Counterclaimants were forced to enter into a forbearance agreement in August 2016 and to continue efforts to sell the dealerships due to BB&T's improper actions.

19. At this time, BB&T contracted with Chris and Kevin Beane, who at all times were agents of BB&T, to perform on-site financial reviews of the Toyota dealership.

20. In October 2016, for no good business reason BB&T significantly reduced its pre-owned floor plan commitment despite the fact that it knew that used car sales were providing considerable gross profits to the Fannin counterclaimants thus reducing the amounts available to run the business and pay loans.

21. BB&T's actions, all stemming from the false allegations of double floor planning, began strangling the businesses of working capital.

FANNIN COUNTERCLAIMANTS' PLAN TO LIQUIDATE AND REPAY LOANS

22. The Fannin Counterclaimants entered into agreements to first sell the Ford dealership, then to obtain a bridge loan to allow them time to finally sell the Toyota dealerships thus ensuring that BB&T's loans would be repaid and the Fannin Counterclaimants would gain financially.

23. On January 16, 2017, the Fannin Counterclaimants reached an agreement with Cole Automotive Group to sell the Ford store with no financing contingencies expecting the sale to close by March 1, 2017.

24. The Ford sale would net approximately $3 million in cash, most of which the Fannin Counterclaimants intended to use to provide working capital to the Toyota dealerships to strengthen that dealership, and BB&T's position in that dealership.

25. BB&T demanded that $2 million of the net proceeds of the Ford sale be used to pay down loans and that another $300,000 be deposited into a restricted account and threatened to immediately cancel the floor plan and call the notes if these demands were not met by the proceeds of the Ford sale.

26. On January 17, 2017, the Fannin Counterclaimants obtained a letter of intent from Eddie Franklin to purchase the Toyota dealerships, with a closing before May 1, 2017, the sale of which would allow the Fannin Counterclaimants to refinance the BB&T term loan.

27. If for any unforeseen reason Eddie Franklin would not close on the Toyota dealerships sale, the Fannin Counterclaimants had a deal with Bill Cole Automotive Group, LLC to close under the same conditions.

28. On January 25, 2017, the Fannin Counterclaimants was approved for a $1 million bridge loan with Community Trust Bank by pledging second mortgage on the Toyota dealerships property that had appraised so high, with those funds going to support the Fannin Counterclaimants while arranging for the sale of the Toyota dealerships.

29. During the first week of February after approval of the Community Trust Bank, Mitch Turknett of BB&T called Kristy Gross of Community Trust Bank and informed her of the confidential forbearance agreement in a reckless and unprofessional call that interfered with the loan, breached BB&T's duties of confidentiality and good faith and fair dealings with the Fannin Counterclaimants.

30. For no good business reason, BB&T refused to allow Community Trust Bank to take a second mortgage on the property despite the fact that BB&T's own appraisal appraised the property for millions of dollars more than the indebtedness.

31. Because of BB&T's improper refusal to allow the second mortgage for no good business reason, Community Trust Bank was able to loan the funds only until the Ford dealership sale closed and not until the Toyota dealership deal closed.

32. Thus BB&T's actions deprived the Fannin counterclaimants of working capital to bridge to the sale of the Toyota dealership.

33. Based on its sole action, BB&T's refusal to cooperate with the bridge loan resulted in no working capital available for Toyota dealership while closing on that sale and thus resulted in less money to pay down the BB&T loan.

### BB&T UNLAWFULLY MISAPPLIES FUNDS

34. On January 20, 2017, the Fannin Counterclaimants contacted Mitch Turknett of BB&T and confronted him with the fact that BB&T was transferring money between the Fannin

13

Counterclaimant entities despite the fact that they were separate business accounts; specifically, BB&T withdrew funds from the Ford account to pay money on other accounts.

35. BB&T converted $276,000 from the Ford dealership funds even though the Ford dealership account was not collateral for any BB&T loan.

36. BB&T's unlawful conversion of these funds caused an improper dishonorment of checks to Ford Motor Credit Company to devastating and severe effect on all of the businesses of the Fannin counterclaimants.

37. By transferring these funds, BB&T incorrectly used Ford dealership money to pay off vehicles owed by the other companies and caused the Ford Motor Credit Company grave concern.

38. BB&T's actions caused the Ford Motor Credit Company to make an emergency visit to the Ford dealership.

39. On January 23, 2017, while the buyer of the Ford store was on site taking equipment and parts inventories, representatives of the Ford Motor Credit Company arrived on site to examine the problems caused by BB&T's failure to keep the accounts separate.

40. By January 26, 2017, BB&T stated that it had corrected the problem that allowed money to be transferred between separate accounts explaining that although the accounts had been de-linked but something in the BB&T system did not recognize that thus allowing cash to be taken from the Ford account that shouldn't have been.

41. BB&T ignored all efforts by the Fannin counterclaimants to correct the misapplication of funds requiring legal counsel from Ford to intercede before BB&T returned the funds.

42. As a result of BB&T's erroneous linking of accounts, the Ford Motor Credit Company demanded the Fannin Counterclaimants keep $250,000 at the Ford store to cover any subsequent issue, thus reducing the working capital anticipated by the $1 million bridge loan.

43. Also as a result of BB&T's erroneous conversion, the purchase of the Ford dealership fell through until the Fannin Counterclaimants begged the purchaser to return to the table and reduced the Ford sale price by $600,000.

CASCADING EFFECTS OF BB&T'S ACTIONS

44.  Beginning with BB&T's baseless accusations of double floor planning and unlawful, immediate cancellation of the floor plan and calling of the loan in the summer of 2016, and continuing with BB&T's unlawful misappropriation of Ford dealership funds causing improper dishonorment of checks to Ford and BB&T's interference with the Community Trust Bank bridge loan, all of the Fannin counterclaimants' plans and businesses were disrupted.

45. BB&T's improper actions caused a reduction in the purchase price of the Ford dealership and caused the bridge loan to extend only to the sale of the Ford dealership not to the sale of the Toyota dealership.

46. Because of BB&T's improper actions, the Fannin Counterclaimants did not have $2 million in cash from the Ford sale to put toward the floor plan loan and did not have $1 million from the Community Trust Bank to use to bridge the Fannin Counterclaimants until the Toyota closing.

47. BB&T cut off the floor plan on April 10, 2017, even though the Fannin Counterclaimants would have been able to pay $2 million on the floor plan and restrict $300,000 from the

bridge loan if BB&T had not unlawfully misappropriated Ford funds and unlawfully interfered with the bridge loan, acts with caused a $600,000 reduction in the sale price of the Ford dealership.

48. The floor plan was ended immediately with no time for the Fannin Counterclaimants to make other provisions, and the term loan was called without adequate time as well, all contrary to Kentucky law.

49. When BB&T cut off the floor plan due solely to its own actions, it caused a drastic reduction in the value of the Toyota dealership property and the Toyota dealerships at that location.

50. Once BB&T's cancellation of the floor plan caused the dealerships to go dark, the franchise agreements ended and the Fannin Counterclaimants lost millions of dollars in equity and in the sale of the Toyota dealership as well as the going concern.

51. Furthermore, BB&T cancellation caused the value of the real estate to plummet from a value of $19.825 million to below the amount of the BB&T mortgage because the business was no longer a going concern.

SERVICE DEPARTMENT BUSINESS DESTRUCTION

52. BB&T's cancellation of the floor plan due to its own unlawful actions converting funds, interfering with the bridge loan and causing the Ford dealership sale to almost fail also destroyed the service department business of the other dealerships.

53. Without a floor plan, parts could not be ordered through ordinary procedures causing cars to back up in the service department while torn down, customers to grow frustrated and impatient, and forcing the service department to turn away business based on scheduling, business that pays quickly and helped keep the dealerships running.

54. The service technicians also became dissatisfied as many were paid on completed jobs. Because the Toyota dealership purchases were buying a going concern they needed to keep competent and satisfied service employees.

55. Additionally, BB&T required that its agents, Chris and Kevin Beane begin locking the service department causes all work to stop when they left the site. As the Beanes left the site at noon on Friday, and did not return until late morning on Monday, the service department was closed during the busiest part of the week.

56. BB&T's destruction of the service department business further reduced the funds available to operate the business and contributed to the interference with the sale of the Toyota dealership which was based on the purchase of a going concern.

### BB&T'S UNWARRANTED POSSESSION

57. On April 10, 2017, BB&T notified the Fannin Counterclaimants that it was accelerating the loans and demanding delivery of keys, certificates of title and certificates of origin to Kevin Beane despite the fact that on that date either Kevin Beane or BB&T had possession of those items and had had them for some time.

58. In that letter, BB&T demanded that the Fannin Counterclaimants cooperate fully but before any time passed, BB&T arrived at 7:15 am the next morning attempting to take possession of vehicles and demanding actions that essentially began shutting down the dealerships and ending any chance for the Toyota dealership sale to go through.

59. Because BB&T had agents stationed on site for months, BB&T was well aware that at that time of day, the only Fannin Counterclaimant on site would be Gary Fannin; and BB&T was well aware that Gary Fannin, a man in his seventies, suffers from dementia and bad health exacerbated by stressful situations.

17

60. Furthermore, because BB&T sent Gary Fannin a copy of the April 10 demand letter only by overnight mail, it knew that Gary Fannin would be completely unaware of the demand at the time that BB&T raided the property the next day.

61. BB&T did not allow the Fannin Counterclaimants any time to respond to the April 10, 2017, letter before it rented car haulers and flew Mr. Turknett and Mr. Findlay from Florida to Kentucky in order to conduct the raid the next day.

62. Kevin Beane did not learn of the raid plans until 9:30 on April 10.

63. Several witnesses, including neighbors to the Toyota dealerships, were outside when BB&T arrived for the raid and witnessed BB&T's agent, possibly Tom Findlay, aggressively confront Gary Fannin putting his hands on him and yelling at him.

64. Chris Fannin arrived to see the assault and battery of his father.

65. Without knowledge of the Fannin Counterclaimants, on April 13, 2017, BB&T filed an ex parte motion to take possession of the businesses and dealerships despite the fact that on that date, BB&T already had for several weeks an agent, either Chris or Kevin Beane, on site at the dealership with the keys and combinations to everything and access to all areas including the financial records.

66. Long before the ex parte motion or even before the attempt to take possession of vehicles on April 11, the Beanes had exclusive possession and access to all vehicle keys, manufacturers' statement of origins on new vehicles and titles on pre-owned vehicles, nothing to move from the property without BB&T's agent's approval.

67. Long before the ex parte motion or even before the attempt to take possession of vehicles on April 11, BB&T was conducting regular and twice weekly floor plan audits.

18

68. In January, BB&T's Tom Findlay and Mitch Turknett were on site demanding additional collateral consisting of firearms, knives and collectible coins in Chris Fannin's office and in safes in a closet on the property. At that time, Mr. Findlay inspected the assets and conveyed that he felt them to be at least $1 million in value. He ordered Kevin Beane to take a detailed inventory, change the locks on the office and closet and keep the keys, and obtain combinations to the safes.

69. On April 11, when BB&T appeared on site, and on May 4 when BB&T took possession, and long afterward, those locations and assets remain secure and in BB&T's control proving that the April 11 demands and ex parte motion were based on exaggerated statement regarding collateral already controlled by BB&T.

70. On May 4, 2017, BB&T appeared at the site of the Toyota dealership at a time when only Gary Fannin was on site with armed U.S. Marshals.

71. With their agents on site and holding all keys and titles, there is absolutely no evidence that any inventory was concealed or in danger of concealment and any statement to the contrary was knowingly false when made.

72. Without first showing anyone on site a court order, BB&T raided the property, taking control over the building before serving a copy of the court order.

COUNT I: BREACH OF CONTRACT

73. The Fannin Counterclaimants hereby incorporate by reference paragraphs 1 through 72 of this Counterclaim as if fully set forth and re-alleged herein.

74. There are valid and existing contractual agreements between the Fannin Counterclaimants and BB&T.

75. BB&T has breached material provisions of the parties' contractually agreements by accelerating the loans when no default has occurred thereunder.

76. BB&T has breached material provisions of the parties' contractually agreements by seeking foreclosure on properties where no default has occurred.

77. BB&T's breach by providing no reasonable time or any time at all before cancelling the floor plan forcing the Fannin Counterclaimants to acquiesce to unreasonable demands and agreements.

78. The Fannin Counterclaimants have suffered damages as a result of BB&T's breach.

COUNT II & III: BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING AND BREACH OF FIDUCIARY DUTY

79. The Fannin Counterclaimants hereby incorporate by reference paragraphs 1 through 78 of this Counterclaim as if fully set forth and re-alleged herein.

80. In Kentucky, every contract has an implied covenant of good faith and fair dealing.

81. In Kentucky, bankers such as BB&T with agents on site and in day-to-day charge of inventory, offices, keys and accounts, have a fiduciary duty to their banking customers.

82. The Fannin Counterclaimants contracts with BB&T constitute valid contracts containing implied covenants of good faith and fair dealing.

83. BB&T has violated the duty of good faith and fair dealing in its contracts with the Fannin Counterclaimants and its fiduciary duty to the Fannin Counterclaimants by, among other things, accelerating the loans when no default has occurred, providing no time to obtain replacement financing, seeking to foreclose on the Fannin Counterclaimants' property when no default has occurred, using allegations of fraud to force concessions during negotiations, withholding permission for a second mortgage on property with equity,

20

discussing private banking information with other bankers, dishonoring checks from unrelated accounts, and demanding possession of collaterally already under control of bank agents in such a manner as to destroy a going concern just before a sale of that concern.

84. The Fannin Counterclaimants have suffered damages as a result of BB&T's breach.

COUNT IV: TORTIOUS INTERFERENCE WITH CONTRACTUAL
RELATIONSHIPS

85. The Fannin Counterclaimants hereby incorporate by reference paragraphs 1 through 84 of this Counterclaim as if fully set forth and re-alleged herein.

86. The Fannin Counterclaimants had various contracts to sell the Ford dealership and the Toyota dealerships as well as franchise agreements and banking agreements with Community Trust Bank during 2016 and 2017.

87. BB&T wrongfully, intentionally and willfully interfered with those contracts by, among other things, causing sales to fall through due to false accusations of double floor planning and improper allegations of breach, refusal to agree to a second mortgage, conversion of funds, causing reduction of sale prices, closing a going concern, and informing third parties of nonpublic information.

88. As a result of BB&T's interference, the various entities with contracts with Fannin Counterclaimants ceased doing business with the Fannin Counterclaimants to the detriment of the Fannin Counterclaimants.

89. As a result of BB&T's interference with the Fannin Counterclaimants' contractual relationships, the Fannin Counterclaimants have suffered damages.

21

## COUNT V. INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE

90. The Fannin Counterclaimants hereby incorporate by reference paragraphs 1 through 89 of this Counterclaim as if fully set forth and re-alleged herein.

91. The Fannin Counterclaimants had various prospective contracts to sell the Ford dealership and the Toyota dealership as well as banking agreements with Community Trust Bank during 2016 and 2017.

92. BB&T wrongfully, intentionally and willfully interfered with those prospective contracts by, among other things, causing sales to fall through due to false accusations of double floor planning and improper allegations of breach, refusal to agree to a second mortgage, conversion of funds, causing reduction of sale prices, closing a going concern, and informing third parties of nonpublic information.

93. As a result of BB&T's interference, the various entities with prospective contracts with Fannin Counterclaimants either altered the terms of the contracts or declined to enter into the contracts to the detriment of the Fannin Counterclaimants.

94. As a result of BB&T's interference with the Fannin Counterclaimants' prospective contractual relationships, the Fannin Counterclaimants have suffered damages.

## COUNT V: NEGLIGENCE

95. The Fannin Counterclaimants hereby incorporate by reference paragraphs 1 through 94 of this Counterclaim as if fully set forth and re-alleged herein.

96. BB&T had a duty to exercise ordinary care in the administration of the Fannin Counterclaimants' loans and a duty to administer such loans in accordance with generally accepting banking practices.

97. BB&T has breached the duty it owes to the Fannin Counterclaimants by, among other things, administering such loans in a manner inconsistent with the loan agreements and generally accepted banking practices.

98. BB&T also breached the duty it owes to the Fannin Counterclaimants by seizing control of the businesses in such a manner to interfere with contracts, disregarding the control exercised by the on-site BB&T agents, the Beanes, thus making further control unnecessary, informing third parties of nonpublic information and by taking advantage of Gary Fannin when BB&T was aware in advance that Gary Fannin was not notified of the raid and was the only Fannin Counterclaimant on site at the time.

99. BB&T has violated the duty of good faith and fair dealing in its contracts with the Fannin Counterclaimants and its fiduciary duty to the Fannin Counterclaimants by, among other things, accelerating the loans when no default has occurred, providing no time to obtain replacement financing, seeking to foreclose on the Fannin Counterclaimants' property when no default has occurred, using allegations of fraud to force concessions during negotiations, withholding permission for a second mortgage on property with equity, discussing private banking information with other bankers, dishonoring checks from unrelated accounts, and demanding possession of collaterally already under control of bank agents in such a manner as to destroy a going concern just before a sale of that concern.

100.    BB&T's breach of duty of care has caused the Fannin Counterclaimants to suffer damages.

COUNT VI: SLANDER

101.    The Fannin Counterclaimants hereby incorporate by reference paragraphs 1

through 100 of this Counterclaim as if fully set forth and re-alleged herein.

102.    BB&T has made false and defamatory statements about the Fannin

Counterclaimants including statements that they were "double floor planning" when Ohio

titles were not signed on the back despite the law in Ohio requiring separate documents.

103.    BB&T also made false and defamatory statements about the Fannin

Counterclaimants' finances at the Ford dealership when it caused checks to be dishonored

making it appear as if the Ford dealership owed money when it did not or had financial

issues when it did not to both the Ford Motor Credit Company and the purchaser.

104.    BB&T made these false and defamatory statements to third parties, including the

Ford Motor Credit Company and the purchasers.

105.    BB&T's statements harmed the reputation of the Fannin Counterclaimants,

lowing them in the estimation of the community and third parties and deterred third

parties from doing business with them.

106.    BB&T's statements were false and constitute defamation *per se* because they

impute an unfitness to perform the duties of their business and/or expose the Fannin

Counterclaimants to public hatred, contempt, scorn and shame.

107.    The defamatory statements were intentional, made with malice or with reckless

disregard for the truth and caused the Fannin Counterclaimants' damages and loss of

business goodwill.

## COUNT VII: IMPROPER DISHONORMENT

108.     The Fannin Counterclaimants hereby incorporate by reference paragraphs 1

through 107 of this Counterclaim as if fully set forth and re-alleged herein.

109.     BB&T took approximately $276,000 from a Ford dealership account without any

permission from any Fannin Counterclaimant and without any contractual right to do so.

110.     BB&T's actions caused checks written on that account to be improperly

dishonored.

111.     BB&T's actions violated banking regulations and caused the Fannin

Counterclaimants damages.

## COUNT VIII: ASSAULT AND BATTERY

112.     The Fannin Counterclaimants hereby incorporate by reference paragraphs 1

through 111 of this Counterclaim as if fully set forth and re-alleged herein.

113.     Despite BB&T's agents, the Beanes, having exclusive possession and access to all

vehicle keys, manufacturers' statement of origins on new vehicles and titles on pre-

owned vehicles so that nothing to move from the property without BB&T's agent's

approval, BB&T wrote a letter on April 10, 2017, stating that it would take possession of

the same and sent that letter to Gary Fannin by overnight mail.

114.     Prior to Gary Fannin receiving the letter, BB&T raided the property at 7:15 in the

morning at a time when it knew that the only Fannin Counterclaimant on site would be

Gary Fannin.

115.     BB&T knew that Gary Fannin had health issues including dementia.

116.     BB&T agents confronted Gary Fannin and forcefully pushed him out of the way in order to take possession of the property before anyone explained to Gary Fannin what was occurring.

117.     Gary Fannin was assaulted and battered in a manner that caused his great distress and fear.

118.     BB&T's assault and battery was intentional and unwarranted and caused the Fannin Counterclaimants damages for which they are due compensatory and punitive damages.

## COUNT IX: CONVERSION

119.     The Fannin Counterclaimants hereby incorporate by reference paragraphs 1 through 118 of this Counterclaim as if fully set forth and re-alleged herein.

120.     BB&T took approximately $276,000 from a Ford dealership account without any permission from any Fannin Counterclaimant and without any contractual right to do so.

121.     BB&T's actions caused checks written on that account to be improperly dishonored.

122.     BB&T's actions violated banking regulations and caused the Fannin Counterclaimants damages.

123.     BB&T's conversion was intentional and unwarranted and caused the Fannin Counterclaimants damages for which they are due compensatory and punitive damages.

## COUNT X: VIOLATION OF DUTY OF CONFIDENTIALITY

124.     The Fannin Counterclaimants hereby incorporate by reference paragraphs 1 through 123 of this Counterclaim as if fully set forth and re-alleged herein.

125.     BB&T owes a duty to the Fannin Counterclaimants to protect nonpublic personal information in conformance with the Gramm-Leach-Bliley Act

126.     BB&T violated that duty when it discussed the foreclosure agreement with Community Trust Bank and discussed inventory and business with third parties, as well as interfered with the banking relationship between the Fannin Defendants and Community Trust Bank.

127.     Upon information and belief BB&T may had discussed nonpublic personal information of the Fannin Counterclaimants with other third parties as well.

128.     BB&T's violation of the Privacy Rule caused the Fannin Counterclaimants to suffer damages.

COUNT XI: IMPROPER WRIT OF POSSESSION

129.     The Fannin Counterclaimants hereby incorporate by reference paragraphs 1 through 128 of this Counterclaim as if fully set forth and re-alleged herein.

130.     Under certain conditions, Kentucky law affords litigants the ability to obtain a writ of possession.

131.     BB&T did not meet the conditions which would allow it to obtain a writ of possession regarding the Fannin Counterclaimants.

132.     Though BB&T had the ability to put the Fannin Counterclaimants on notice that it was seeking a writ of possession to seize the property of the Fannin Counterclaimants, it did not provide notice.

133.     Because BB&T had agents on site who held all keys and titles and controlled all inventory, it had no evidence that any of the collateral was ever in danger of concealment or improper sale and any statement to the contrary was knowingly false.

134.    As a result of BB&T's failure to provide notice, the Fannin Defendants were not able to present a meaningful defense to the motion for writ; thus, BB&T denied the Fannin Counterclaimants due process under law, destroyed their business and caused the sale of the business as a going concern, a sale worth millions of dollars, to fall through.

135.    BB&T's failures caused the Court to wrongfully issue the writ and deprived the Fannin Counterclaimants of their possessions and control over their property, some of which BB&T has no right to under any contract and some of which BB&T had not satisfied the conditions to allow it to possess.

136.    The Fannin Counterclaimants suffered damages as a result of the wrongful deprivation of their due process and their property and BB&T is liable for such damages which include any bond, costs, and attorney fees.

## COUNT XII: DECLARATION OF RIGHTS

137.    The Fannin Counterclaimants hereby incorporate by reference paragraphs 1 through 136 of this Counterclaim as if fully set forth and re-alleged herein.

138.    The Fannin Counterclaimants seek a declaration that the jury waivers contained in the BB&T loan documents are unconstitutional and unenforceable.

139.    Said waivers were obtained under duress and were not voluntarily or knowingly entered into.

140.    Said waivers are also in violation of Section 7 of the Kentucky constitution which holds jury trials to be inviolate.

## COUNT XI: PUNITIVE DAMAGES

141.    The Fannin Counterclaimants hereby incorporate by reference paragraphs 1 through 140 of this Counterclaim as if fully set forth and re-alleged herein.

142.     BB&T acted with gross negligence, reckless disregard for the rights of the Fannin Counterclaimants, and with malice and oppression in its actions toward the Fannin Counterclaimants.

143.     BB&T also acted intentionally in its actions toward the Fannin Counterclaimants.

144.     The Fannin Counterclaimants are entitled to punitive damages in an amount to be determined by a jury.

WHEREFORE, the Fannin Counterclaimants respectfully pray and demand that they be granted the following relief:

1.  Trial by jury;

2.  Dismissal of Plaintiff's Amended Complaint against them;

3.  Compensatory damages;

4.  Damages arising from the improper writ and from the bond;

5.  Consequential damages;

6.  Punitive damages;

7.  Costs and attorneys' fees; and

8.  Any other relief to which they may appear entitled.

Respectfully submitted,


/s/ Laurence J Zielke
Laurence J. Zielke
Janice M. Theriot
Zielke Law Firm, PLLC
462 S. Fourth Street, Suite 1250
Louisville, KY 40202
(502) 589-4600
*Counsel for the Fannin Counterclaimants*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing was sent via the CM/ECF system to the following:

Brian H. Meldrum          bmeldrum@stites.com
Brian Robert Pollock      bpollock@stites.com
Stites & Harbison, PLLC
400 W. Market Street, Suite 1800
Louisville, KY 40202

Daniel King, III          danking2800@gmail.com
1200 Bath Avenue
Ashland, KY 41101

And by U.S. Mail, First Class, postage pre-paid, this 21 day of June, 2017 to the following:

Donald E. Smith
Donna J. Smith
3501 Briarwood Drive
Catlettsburg, KY 41129

City of Ashland
Stephen E. Gilmore, Mayor
1700 Greenup Avenue
Ashland, KY 41101

                                    /s/ Laurence J. Zielke
                                    Laurence J. Zielke